# Exhibit 1

STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
Civil Action
Docket No. CV-20-_____

| | |
|---|---|
| JAMES BRENT MILLER, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| ACADIA HEALTHCARE CO., INC., | ) |
| | ) |
| Defendant | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff James Brent Miller complains against Defendant Acadia Healthcare Co., Inc., as follows:

### PARTIES

1.  Plaintiff James Brent Miller ("Miller" or "Plaintiff") is a resident of Clinton, Kennebec County, Maine.

2.  Defendant Acadia Healthcare Co., Inc. ("Acadia" or "Defendant") is a Delaware corporation with its principal place of business in Franklin, Tennessee.

3.  For about a decade, Miller worked for Discovery House-Group Inc., which was acquired by Acadia in 2015. In April 2017, Acadia unlawfully terminated his employment.

## JURY TRIAL DEMAND

4.  Under Me. R. Civ. P. 38(a), Plaintiff demands trial by jury on all issues triable to a jury.

## JURISDICTION

5.  This action arises under the Maine Human Rights Act, Me. Rev. Stat., tit. 5, § 4551 *et seq.* and the Maine Whistleblowers' Protection Act, Me. Rev. State., tit. 26, § 831, *et seq.*

6.  This Court has subject matter jurisdiction of Plaintiff's claims under Me. Rev. Stat., tit. 5, § 4621.

## VENUE

7.  Venue is proper in Kennebec County under Me. Rev. Stat., tit. 14, §§ 501 and 505 as Plaintiff lives and resides in Kennebec County.

## EXHAUSTION OF REMEDIES

8.  Plaintiff filed a timely complaint with the Maine Human Rights Commission ("MHRC"). The MHRC found there are reasonable grounds to believe that the termination of his employment resulted from his protected conduct as a whistleblower.

9.  Following a failure of conciliation, the MHRC issued Plaintiff a letter, dated November 25, 2019, giving him until February 23, 2020 to file this action. A true copy of that letter is attached as Exhibit A.

## FACTUAL ALLEGATIONS

## Background

10. Acadia provides behavior healthcare services. It operates a network of approximately 576 behavioral healthcare facilities in 39 U.S. States, Puerto Rico, and the United Kingdom.

11. The Discovery House-Group Inc. ("DH") provided outpatient treatment services, such as maintenance and long-term detoxification, addiction education services, drug-free counseling, and medical examinations to individuals addicted to drugs.

12. DH operated approximately 19 clinics (7 or 8 in Pennsylvania, 3 in Rhode Island, 4 in Maine, and 3 or 4 in Utah). One of its Maine clinics, located in Bangor, provided both methadone and suboxone treatment to its patients.

13. From June 2007 forward, Miller served as the director of DH's clinic in Bangor.

14. On November 1, 2015, Acadia acquired DH and its subsidiaries for $118.3 million. Miller maintained his position as director of the Bangor clinic after the acquisition by Acadia.

15. During Miller's time directing the Bangor clinic, he received exemplary employment reviews.

16. Under Miller's leadership, the Bangor facility grew into a thriving clinic. The Bangor clinic tied for first place in 2015 when DH evaluated all of its clinics prior to the Acadia acquisition. DH awarded Miller's clinic with an extra 4.5% of payroll in recognition of this honor, which Miller then distributed to those under his leadership.

17. In or around 2009 or 2010, DH asked Miller to direct a turn-around of DH's low-performing clinic in Calais, Maine. Miller accepted this challenge and directed DH's Calais and Bangor clinics simultaneously for over a year. He was successful in transforming the Calais clinic into a successful facility.

18. After the Acadia acquisition, the Bangor clinic became part of a network of 115 methadone clinics in 26 states. This network is a division of Acadia known as the Comprehensive Treatment Centers ("CTC"). The CTC has approximately 2,300 employees. Acadia as a whole owns numerous hospitals and mental health facilities; it employs a workforce of approximately 24,000 employees.

## Concern About Re-Disclosure of Sensitive Information

19. Many changes took place at the Bangor clinic following the Acadia acquisition. For example, Acadia changed the intake procedure for patients.

20. Under DH's ownership, a person seeking treatment could call the Bangor clinic directly, complete an intake interview with an intake coordinator, and then receive treatment from a counselor.

21. After the acquisition, however, individuals seeking treatment no longer could contact the Bangor clinic directly. Instead, Acadia required them to utilize a third party intake service, which involved providing their personal information over the phone to someone located outside of Maine. Information provided in that call eventually would be routed to the Bangor clinic, where an intake coordinator would call back the prospective patient and go over all of the sensitive information for a second time.

22. When Acadia implemented this new intake process, two different intake coordinators employed at the Bangor clinic approached Miller on separate occasions to express their concerns. Each believed the new intake process violated the federal laws protecting patients' rights. Federal regulations set forth in 42 C.F.R. Subpart B (42 C.F.R. § 2.11 *et seq.*) (the "Regulations"), prohibit the re-disclosure of sensitive information. Both of the Bangor intake coordinators believed the Regulations protected patients from having to go through two separate intake conversations.

23. Plaintiff arranged a joint meeting with both intake coordinators to discuss their concern. Plaintiff assured them he would act immediately and take the appropriate steps to address the issue.

24. Miller immediately approached his direct supervisor at Acadia, Helene Murphy ("Murphy") to address the intake coordinators' concerns. Murphy served as Acadia's Northeast Regional Director for the CTC Division. She

oversaw seven of Acadia's clinics: four in Maine, one in New Hampshire, and two in Vermont.

25. Miller expressed to Murphy the bases for his good faith belief that Acadia's new intake practice violated the Regulations. She told him she would get back to him.

26. Murphy, however, did not reply to Miller in any way over the next few weeks. In response to this silence from Murphy, Miller took the concerns expressed by the intake coordinators directly to Celeste Jupinko ("Jupinko"), Acadia's Vice President of Clinical Services, and John Peloquin ("Peloquin"), President of Acadia's CTC. He sent them both an email outlining his concern about the violation of law.

27. Both Jupinko and Peloquin responded to Miller, saying they would look into the issue.

28. About a day later, Murphy called Miller. During the phone call, she was livid and accused Miller of betraying her by "going over her head" with his concerns. She ordered him never to contact senior management again.

29. Miller was shaken by Murphy's unreasonable tone and demeanor. He immediately feared that Murphy might fire him for standing up for principle by making a good faith report concerning a potential violation of law.

30. Eventually, Jupinko, Murphy, and others informed Miller that they had investigated the intake issue and obtained the advice of the company's

6

legal counsel. They assured Miller that Acadia's intake procedure was in compliance with the federal Health Insurance Portability and Accountability Act ("HIPAA"). Miller explained that the concern raised actually concerned the Regulations, not HIPAA; he explained why he believed the Regulations were stricter than HIPAA. The Acadia officials disregarded his perspective, telling him that his interpretation was wrong.

31. Murphy continued to be angry about Miller having raised the issue and pushing back when told that the company's practices did not violate the law. The next time she saw Miller, during an in-person meeting at Acadia's clinic in Waterville, Maine, she asked to speak with him alone. Once they were alone, she threatened him, told him she could not trust him, and ordered him to never go "around her" again.

## Concern About Counselor-Patient Ratio

32. In or around 2008, Maine's Department of Health and Human Services ("DHHS") promulgated regulations governing Opioid Treatment Programs ("OTPs"), like the Bangor clinic that Miller directed. These state regulations limited the maximum number of patients per counselor: counselors with less than one year of experience could see a maximum of 35 patients at one time, and counselors with more than one year of experience could see a maximum of 50 patients at a time. DHHS also set standards regulating how many times a counselor needed to see each patient on a monthly basis ("counseling

7

standards") and how many and what types of documents a counselor needed to complete for each patient ("documenting standards").

33. Working for DH from 2008 through 2010, Plaintiff observed the implementation of the new DHHS regulations. He determined that the new standards were workable and provided a safe standard for counseling care of the clinic's patients.

34. In 2010, the State of Maine cut funding for OTPs by 10%. With 10% less in resources, it became more difficult for clinics to conform to the regulatory standards. Then, in 2012, under the LePage administration, the State of Maine cut funding for OTPs by a further 16%.

35. Miller, like other clinic directors, was very upset by this further cut, as sufficient resources were needed to operate an OTP clinic safely and effectively, while complying with all regulatory standards.

36. On April 2, 2012, Tracy Weymouth ("Weymouth"), a representative from the Opioid Treatment Authority of Maine's Office of Substance Abuse ("OSA"), sent an email to OTP clinic directors in Maine. Weymouth wrote that OSA was "aware of the possible financial difficulties resulting from the reduced rate cut," and that OSA had developed a "short term waiver" that all the clinics could utilize. The Weymouth email highlighted the concern that it had become difficult to "provide adequate substance abuse counseling to each patient as clinically necessary" given the recent funding reductions.

8

37. Under this short term waiver, which lasted for three months, counselors could serve 150 patients instead of 35 or 50.

38. This ratio of 1:150 became the de facto rule, but individual clinics could set lower ratios, depending on their patients' particular needs.

39. Miller strongly believed that the ratio for the Bangor clinic should not be 1:150, and should be no higher than 1:80. He expressed this opinion to Peter Morris, DH's Chief Financial and Operating Officer. DH, however, set the counseling ratio for its clinics at 1:125.

40. Between 2012 and 2015, no OTP clinic in Maine, other than those operated by DH, had a ratio as high as 1:125. All of the other OTP providers in Maine implemented a ratio of 1:80 or less.

41. Desiring a reduction in the counseling ratio, Miller initiated a 3-6 month study in or around 2014-2015 to determine whether a 1:80 ratio would be safer than DH's chosen ratio of 1:125. He presented DH with a summary report of the study's findings, but DH opted not to reduce the 1:125 ratio.

42. Miller remained extremely concerned because the combination of limited funding, additional regulations promulgated by the LePage administration (including increased documentation requirements), and DH's high counselor-to-patients ratio, led to tremendous difficulty in complying with the applicable standards of care.

43. Miller tried to fix the problem, and brought his concerns to DH's management team on multiple occasions, without success.

44. Despite having many overworked counselors, Miller continued to do his very best to keep the clinic running effectively. He took steps to keep the actual numbers of patients per counselor as low as he possibly could.

45. After Acadia acquired DH in November 2015, Acadia maintained the 1:125 counselor-to-patient ratio.

46. Miller then raised his concerns about the counselor-to-patient ratio with his new supervisor, Murphy. He explained to her why Acadia should reduce the ratio to at most 1:80. He also mentioned what he had observed regarding patient safety issues and the risk of non-compliance with state standards of care. Murphy, however, disregarded Miller's multiple pleas to reduce the ratio.

47. In or around December 2016, a specific opportunity arose with the state that would have permitted a reduction of the ratio. Miller again lobbied Murphy to change the ratio and increase the level of patient safety. Murphy, annoyed by Miller's insistence on promoting patient safety, rejected his ideas and told him she did not want him arguing with her.

48. In total disregard of Miller's concerns, Murphy instructed him to submit to the state a request that methadone counselors William Allen, Christa Campbell, Olivia Malloch, Jamie McKay, Samantha Pike, and Jody

10

Veillette have a ratio of 1:125, and that suboxone counselor Joni Rodgers have a ratio of 1:100.

49. Miller was disheartened and distressed by Murphy's behavior and by her complete disregard for his patient safety concerns.

50. Miller noticed that Murphy was cutting expenses wherever she could. For instance, she ordered directors to get approval for any expense greater than $50; she would pile an exorbitant amount of extra work onto employees, while repeatedly ordering them not to work overtime; and she kept the counseling ratios as high as possible.

51. Miller complied with Murphy's order to submit the waiver request to the state in or around December 2016, even though he disagreed with the contents of the request. He did not report his objection to Acadia's senior management because, as stated earlier, Murphy had ordered him not to communicate with senior-level managers. Miller could not afford to lose his job as he had a disabled wife at home in need of his financial support. He had no choice but to submit to Murphy's demands.

52. On January 1, 2017, Weymouth's successor, Katherine Coutu-Farrell ("Coutu-Farrell"), approved Murphy's request for high counselor ratios.

## Concern About Murphy Violating Terms of a Contract with the State

53. In or around January or February 2017, the Bangor clinic received a state grant. Miller reviewed the terms of the agreement, and understood that

the grant was designed to aid the clinic in bringing in new, uninsured patients.

54. In a meeting with Miller and Joanna Amoling ("Amoling"), Miller's administrative assistant, Murphy stated that Acadia would lose the grant money if the clinic did not bring in new clients within the time limit. She directed Amoling to send out applications to current patients of the Bangor clinic, asking them about their financial status.

55. Miller complained to Murphy that this approach would not be in compliance with the terms of the grant. He told her it would not be appropriate to recruit current patients to sign up for grant funding as the purpose of the grant was to generate new, uninsured patients.

56. Murphy again disregarded Miller's concerns. She instructed him that everything was fine and to comply with her directions.

### **Concern About Murphy Failing To Pay Amoling Overtime**

57. Near the beginning of 2017, Murphy asked Miller if his assistant, Amoling, could do some administrative tasks she needed to have done.

58. Miller told Murphy to discuss the matter with Amoling, but told Murphy that Amoling was incredibly busy at that time, as she was not only doing her own job, but also covering for the Program Specialist, who was on medical leave.

59. Amoling later told Miller that she was doing extra work for Murphy, but that she was struggling to balance her workload given the extra work Murphy had assigned her.

60. Miller then communicated to Murphy his concern that she was working Amoling too hard. Murphy responded that it was fine and not to worry.

61. Sometime in late March or early April 2017, Miller learned that Murphy had not been paying Amoling for the overtime hours she was devoting to completing Murphy's work. He approached Murphy and reminded her that the Fair Labor Standards Act required her to pay Amoling overtime if she worked in excess of 40 hours per week. He expressed concern that Murphy was not complying with the legal requirements for compensating a non-exempt employee like Amoling.

62. Murphy terminated Miller's employment shortly after he made this report.

## Pretext

63. The State of Maine collects incident reports ("IRs") from OTPs whenever there are "incidents" with patients. These IRs, once submitted to the state, are not released publicly.

64. Any OTP employee who witnesses an incident may fill out an IR, but a supervisor must review and sign every IR prior to submission. There is space for a supervisor's signature at the bottom of each IR form.

13

65. The State of Maine does not mandate which supervisory staff must review and sign IRs; this decision is left up to each clinic. The state also does not mandate that the supervisor signing off on the IR have actual knowledge of the events described in the IR. Rather, the supervisor's role is to ensure that the IR form is filled out correctly and completely, and to catch any obvious errors, such as a failure to redact a patient's name.

66. Prior to the Acadia acquisition, Miller had asked his Clinical Supervisor, Carroll Ackley ("Ackley"), to be the supervisor primarily responsible for signing off on IRs.

67. Miller, however, also occasionally signed IRs as well. In the fall of 2016, for instance, Program Specialist Eric Herschell ("Herschell") often brought IRs directly to Miller for review and signature. Miller would sign these IRs using his own name. Despite this, the vast majority of the IRs were handled by Ackley.

68. On February 27, 2017, counselor Jody Veillette ("Veillette") filled out an IR, writing that she learned on the news that a patient of the clinic had been in a car accident and passed away (the "February IR"). Herschell returned from medical leave that same day, February 27, 2017.

69. Veillette forgot to redact identifying information in one place on the February IR form, although she did use "pt" to refer to the patient in most places on the form (her mistake was buried in the middle of a paragraph).

14

70. Herschell had been responsible for submitting IRs to the state before his medical leave, but his duties had been re-assigned during his absence. There was some confusion about whether he would resume his prior IR submission duties upon his return from leave.

71. On or about March 1, 2017, Miller was at the Bangor clinic at around 5:00-6:00pm and discovered that the February IR had been placed in his mailbox. Ackley was not at the Bangor clinic at this time, and Miller did not know who had placed the February IR in his mailbox. Knowing that Ackley was not there, Miller reviewed the February IR, noticed that Veillette had filled it out, and also noticed that it was late in being submitted to the state (the state requires such IRs to be submitted within 24 hours of the incident).

72. In reviewing the February IR form, Miller failed to notice the single place where Veillette had accidentally included identifying information in the middle of a paragraph. In recognition of Ackley's primary role in receiving and signing off on such IR forms, he signed Ackley's name on the supervisor signature line, but plainly wrote his initials ("BM") in parentheses right under the "y" of Ackley's name to make it clear that he, not Ackley, was the supervisor signing off on the February IR.

73. Miller then placed the signed February IR in the appropriate box in the administrative office so it could be transmitted to the state the next morning.

74. On or around April 19, 2017, Coutu-Farrell visited the Bangor clinic and asked to speak with Miller and Ackley. She asked Miller if he was aware that all death reports are investigated; he said that he was. She also asked him if he was the one who had signed the February IR, and showed him a copy. Miller confirmed that he had. She then asked Miller if he knew that this could affect Ackley's license. Miller replied that he did not and expressed confusion over the reasons for her questions. The conversation stopped there and Coutu-Farrell dismissed him. She asked no other questions relating to the context surrounding the February IR or why Miller had signed the report in the manner he did. This meeting of five minutes or less was the only time Miller ever spoke with Coutu-Farrell regarding the February IR.

75. Coutu-Farrell next sent Murphy a letter dated April 19, 2017, which stated that the February IR included patient-identifying information and, although it appeared to be signed by Ackley, it actually had been signed by Miller. Coutu-Farrell wrote that this action "could be perceived as fraud," and indicated that Miller should sign only his own name to such documents "in the future."

76. After receiving this April 19, 2017 letter from the state, Murphy never asked Miller to explain the circumstances surrounding the February IR.

77.  Instead, Murphy contacted Miller on or about April 24, 2017, asking him to meet with her privately on Wednesday, April 26, 2017. She mentioned nothing about the February IR.

78.  Miller then noticed in the payroll system that his benefits were to be paid out in his next paycheck, which indicated to him that Murphy planned to fire him.

79.  On Wednesday, April 26, 2017, Murphy met with Miller in a hotel. She made no inquiry into the circumstances surrounding Plaintiff's signing the February IR with Ackley's name and his own initials. She told him she was firing him for "fraudulent behavior." She then quickly showed him the April 19, 2017 letter from Coutu-Farrell and handed him a termination letter. The termination letter stated that his "fraudulent behavior" placed Acadia's patients, staff, and company at risk.

80.  Murphy told staff at the Bangor clinic that she had fired their director because he had violated the law and had been fraudulent. Through this statement, she harmed Miller's reputation.

81.  Miller suffered severe emotional distress as a result of Murphy's actions. He also suffered financially as a result of the termination of his employment with Acadia.

## COUNT I
## Violation of the Maine Whistleblowers' Protection Act
## 26 M.R.S.A. § 831 *et. seq.*

82. Plaintiff incorporates his allegations contained in Paragraphs 1-81.

83. The Maine Whistleblowers' Protection Act ("WPA") prohibits Acadia from discharging, threatening, or otherwise discriminating against Plaintiff for reporting what he had reasonable cause to believe was a violation of law or rule. *See* 26 M.R.S.A. § 833(1)(A).

84. Acadia discharged, threatened, and otherwise discriminated against Plaintiff for reporting what he had reasonable cause to believe were violations of law or rules, as explained above.

85. The WPA also prohibited Acadia from discharging, threatening, or otherwise discriminating against Plaintiff for reporting what he had reasonable cause to believe was a condition or practice that would put at risk the health or safety of any individual. *See* 26 M.R.S.A. § 833(1)(B).

86. Acadia discharged, threatened and otherwise discriminated against Plaintiff for reporting what he had reasonable cause to believe were conditions or practices that put at risk the health or safety of patients, as explained above.

87. The WPA prohibited Acadia from discharging, threatening, or otherwise discriminating against Plaintiff for reporting what he had reasonable cause to believe was an act or omission that constituted a

deviation from the applicable standard of care for a patient. *See* 26 M.R.S.A. § 833(1)(E).

88. Acadia discharged, threatened and otherwise discriminated against Plaintiff for reporting what he had reasonable cause to believe were acts or omissions that constituted a deviation from the applicable standard of care for patients.

89. As a result of Acadia's violation of the WPA, Plaintiff has been damaged financially and emotionally.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Acadia, as follows:

1. Finding that Acadia violated the Maine Whistleblowers' Protection Act;

2. Awarding Plaintiff the damages he has incurred in an amount that is reasonable in the premises, including lost wages and benefits, compensatory damages, and punitive damages;

3. Awarding Plaintiff his attorney's fees and costs; and

4. Granting such other and further relief as may be appropriate.

Dated: February 14, 2020.            Respectfully submitted,


                                     *Richard O'Meara.*
                                     Alison E. Tozier, Esq., Bar No. 5633
                                     Richard L. O'Meara, Esq., Bar No. 3510
                                     MURRAY PLUMB & MURRAY
                                     75 Pearl Street, P.O. Box 9785
                                     Portland, ME  04104-5085
                                     (207)773-5651
                                     (207) 773-8023 (Fax)
                                     atozier@mpmlaw.com
                                     romeara@mpmlaw.com
                                     *Counsel for Plaintiff James Brent Miller*





**Amy M. Sneirson**
EXECUTIVE DIRECTOR

**Maine Human Rights Commission**
# 51 State House Station, Augusta, ME 04333-0051

*Physical location: 19 Union Street, Augusta, ME 04330*
Phone (207) 624-6290  ■  Fax (207) 624-8729  ■  TTY: Maine Relay 711
*www.maine.gov/mhrc*

**Barbara Archer Hirsch**
COMMISSION COUNSEL

EXHIBIT
A

November 25, 2019

Richard O'Meara
Murray Plumb & Murray
75 Pearl Street
Portland, ME 04104

Brittany Stancombe
Waller
511 Union Street, Suite 270
Nashville, TN 37219

Tara Walker
Bernstein Shur
100 Middle Street
Portland, ME 04104

Re:   E17-0464-A/B, Miller v. Acadia Healthcare Company, Inc. and DHG Services, LLC

To the Parties in this case:

I am writing to inform you that conciliation has concluded without success.

Accordingly, I am referring the file to Commission Counsel Barbara Archer Hirsch so she can review the file and make a recommendation to the Commissioners regarding whether the Commission should file suit in this case. As I have explained before, the Commissioners will review Ms. Archer Hirsch's recommendation and then vote as to whether to file suit in this case.

Please be reminded that Complainant retains the right to file a civil action to attempt relief under the Maine Human Rights Act. Such an action must be commenced within 2 years after the act of alleged unlawful discrimination complained of, or within 90 days from the date of this letter, whichever is later. There may be additional deadlines that apply if Complainant brings claims in addition to those filed under the Maine Human Rights Act.

If you have questions regarding this case, please contact Ms. Archer Hirsch.

Sincerely,

*Amy M. Sneirson*

Amy Sneirson
Executive Director

cc:   James Miller
      Helen Murphy